**HOUSTON INSULATION CONTRACTORS ASSOCIATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 21910.**

United States Court of Appeals Fifth Circuit.

March 9, 1966.

See, also, 5 Cir., 339 F.2d 868.

W. D. Deakins, Jr., Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Stephen B. Goldberg, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Linda R. Sher, Attys., N. L. R. B., for respondent.

Thomas J. Mitchell, Houston, Tex., Joseph A. Sickles, Bethesda, Md., for Amicus Curiae, Sherman, Dunn & Sickles, Washington, D. C., Combs & Mitchell, Houston, Tex., of counsel.

Before WOODBURY,* WISDOM and BELL, Circuit Judges.

WOODBURY, Senior Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board dismissing a complaint issued upon charges filed by an association of contractors against two local unions and their parent union.

The petitioner, Houston Insulation Contractors Association, Contractors Association or simply Association, hereinafter, consists of a group of contracting companies in the Houston area banded together for the purpose, *inter alia*, of negotiating and administering collective bargaining agreements with Local 22 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL–CIO. Article VI of the collective bargaining agreement in force between these parties at the time involved provided in material part: "The Employer agrees that he will not sublet or contract out any work described in Article XIII," which included "preparation" and "application" of coverings for the insulation of hot and cold surfaces such as pipes, boilers, tanks etc.

Johns-Manville Sales Corporation is a member of the Contractors Association. In 1963 it was engaged in applying insulation to pipe at a construction project at Texas City, Texas, within the territorial jurisdiction of Local 22. In order to secure the insulation to the pipe Johns-Manville's employees cut coils of stainless steel sheets into strips or bands used to hold the insulation around the pipe. In June or July Johns-Manville purchased pre-cut stainless steel bands from Techalloy Company, Inc., a non-union producer of metal products. Johns-Manville em-

* Senior Judge of the First Circuit sitting by designation.

ployees at the direction of their union officers refused to apply the pre-cut bands.

Armstrong Contracting and Supply Corporation is another member of the Contractors Association. In 1963 it was engaged in applying asbestos insulation to pipes at a construction project in Victoria, Texas, which is not within the territorial jurisdiction of Local 22, but of Local 113 of the International Union. For several years Armstrong had purchased straight lengths of premolded asbestos insulation from Thorpe Products Company, a non-union firm, which Armstrong's union employees had mitered, that is to say, cut at angles with a saw and glued the cut sections together so that the straight-length material could be used to cover curves or angles in pipe. Originally mitering had been done on the job with hand tools. At the time involved, however, and apparently for several years before, mitering had been done in Armstrong's shop in Houston by its employee-members of Local 22 using power tools inconvenient to move and the mitered fittings delivered to the jobsite. In the summer of 1963 Armstrong purchased pre-mitered fittings from non-union Thorpe Products Company. Armstrong's employees on the Victoria job, members of Local 113, at their union officers' direction refused to apply these pre-mitered fittings.

The Contractors Association filed charges against the International Union and its Locals 22 and 113 on which general counsel for the Board issued a complaint charging that the refusals to apply the goods of Thorpe and Techalloy constituted an unlawful secondary boycott within the meaning of § 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act as it now stands amended, 29 U.S.C. § 158(b) (4) (i) and (ii) (B),[1] asserting that at least "an object" of the refusal to apply, which admittedly amounts to coercion, was to require Johns-Manville and Armstrong to cease doing business with Thorpe and Techalloy. The International Union and the Locals denied that the refusals to use and apply the products of Thorpe and Techalloy constituted a secondary boycott. They asserted that the refusals were protected primary activity because the sole object thereof was to preserve work their members were entitled to perform by virtue of the ban on subcontracting in the collective bargaining agreement.[2]

After hearing, the trial examiner found that "this was not a boycott of nonunion products." And he ruled that "Articles VI and XIII of the agreement with the Contractors Association are lawful." Nevertheless he concluded that the refusal to handle Thorpe and Techalloy

1. "It shall be an unfair labor practice for a labor organization or its agents—

 \* \* \* \* \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce \* \* \* to engage in, a strike or a refusal in the course of his employment to use, \* \* \* process, \* \* \* or otherwise handle or work on any goods, articles, materials, or commodities \* \* \* or (ii) to threaten, coerce, or restrain any person engaged in commerce \* \* \* where in either case an object thereof is \* \* \*

 \* \* \* \* \*

"(B) forcing or requiring any person to cease using, \* \* \* handling, \* \* \* or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person,

\* \* \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; \* \* \*."

2. In the contract between Local 22 and the Contractors Association the employers agreed that in their operations outside the chartered territory of Local 22 they would abide by the rates of pay, rules and working conditions established by collective bargaining contracts between local insulation contractors and the local union in that territory. Local 113's contract with employers operating within its territorial jurisdiction where the work stoppage involving Armstrong's employees occurred contains a ban against subcontracting similar to the one in the contract between the Contractors Association and Local 22.

products was unlawful wherefore he recommended a cease and desist order against the local unions but not against the International Union saying that the dispute was a local one and that he had "no evidence that the International directed it or intervened in it."

The trial examiner rested his conclusion of unlawful activity by the local unions on § 8(e) of the Act, 29 U.S.C. § 158(e), quoted in material part in the margin.[3] He said that the agreement between the Contractors Association and Local 22 was "clearly a contract aimed at the exemption of Section 8(e)." But he said that the exemption did not apply because the evidence was clear that mitering and cutting bands, even when performed by Armstrong and Johns-Manville employees, was performed at their shops and not at the jobsite. In addition he ruled that, even if the workers were entitled to preserve the work of mitering and cutting bands by the contract, they were not entitled under the rule of the so-called Sand Door case, Local 1976, United Brotherhood of Carpenters etc., v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), to resort to economic coercion to enforce the contract.

The three-member panel to which the Board delegated its powers pursuant to § 3(b) of the Act disagreed with the trial examiner and ordered the complaint dismissed in its entirety. Without discussing the impact of § 8(e) of the Act, although that section provided the basis for the trial examiner's decision, the panel held that the activities of the two local unions were primary because "the object" thereof was to enforce the ban on subcontracting work properly claimed by the employees under the collective bargaining agreement the lawfulness of which it said appeared to be conceded.

On the basis of its conclusion of no unlawful activity by the local unions, it dismissed the complaint as to the International Union.

One member of the panel dissented from the order insofar as it dismissed the charge against Local 113. The majority of the panel pointed out that although Local 113 had no contract with the Contractors Association, nevertheless the Association had agreed with Local 22 that its member companies when operating outside the territorial jurisdiction of that union would "abide by the rates of pay, rules and working conditions established by collective bargaining agreements between the Local (sic) insulation contractors and the local union in that jurisdiction" and that Local 113's contract in its jurisdiction contained a ban on subcontracting identical with that in Local 22's contract with the Association. Wherefore the majority held that whether Local 113 be "regarded as a third-party beneficiary of Local 22's bargaining contract or as agent of Local 22, it had the right to insist, in accordance with the terms of the contract, that Armstrong adhere to the lawful no-subcontracting clause." The dissenting member of the panel said that Local 113 was not a third-party beneficiary of Local 22's bargaining contract with Armstrong and that there was nothing to show that it was acting as agent for Local 22. He considered that since Local 113 had no agreement with the Contractors Association, its attempt to enforce the contract for the benefit of Local 22 constituted unlawful secondary activity.

The petitioner insists in this court that both the facts and the law require the Board to find that all three unions had violated § 8(b)(4)(i) and (ii)(B) of the Act.

3. "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, * * * whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, * * * or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any con-

tract * * * containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, * * *."

On the facts, the petitioner contends that the record conclusively shows that "an object" of the refusals to apply was to force Johns-Manville and Armstrong to cease doing business with Techalloy and Thorpe. In support of this contention it would have us give conclusive effect to the testimony of one Brooks Baker, an officer of Local 22 and a vice-president of the International Union, who at one point testified that he had instructed the men not to handle the products of Thorpe and Techalloy because "we are not in agreement with Thorpe or Techalloy." This testimony does indicate that Baker at least may have believed that "an object" of the refusals to handle and apply was to force Johns-Manville and Armstrong to cease doing business with Thorpe and Techalloy. But the Board was not required as a matter of law to accept Baker's statement as gospel in the face of ample testimony, including later testimony of Baker himself, to the effect that the unions' objective was work preservation and in the face of the undisputed testimony that although Thorpe and Techalloy were non-union employers, neither local union had ever protested the use or application of any of their other products purchased by Johns-Manville or Armstrong but only protested the pre-cut bands and pre-mitered fittings. It may well be that the union officials hoped and expected, certainly we may assume that they would not have minded, if a result of their members' refusal to use and apply the bands and fittings was to put pressure on Techalloy and Thorpe as non-union employers. But hopes and expectations do not necessarily constitute "objects." An illegal "object" is something more than a result, even an inevitable result, of a work stoppage for a legitimate reason. Otherwise the right to strike would for practical purposes be nullified, a result which Congress clearly did not intend. See Retail Clerks Union Local 770, etc. v. NLRB, 111 U.S.App. D.C. 246, 296 F.2d 368, 373 (C.A.D.C. 1961). The distinction to be drawn as best one can is between an object and a consequence. See Local 761, International Union of Electrical, etc., Workers, AFL–CIO v. NLRB, 366 U.S. 667, 672 et seq., 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

The petitioner also would have us find conclusive evidence of an unlawful union object in its use of gummed labels or decals. These were supplied by the International Union to employers under contract with its locals and were applied by the union workers to the goods they made. The decals bore serial numbers by which the employer could be identified. When Johns-Manville and Armstrong employees received the Techalloy bands and Thorpe mitered fittings without decals they refused to apply them.

The use of decals is in itself a neutral fact. The decals could be used as a means of boycotting non-union goods or they could be used as a means of policing the ban on subcontracting. There is ample testimony in the record to support the conclusion that in this case the decals were used to police the ban on subcontracting. Moreover, there is undisputed testimony that other products of Thorpe and Techalloy purchased by Armstrong and Johns-Manville, which of course did not bear union decals, were not boycotted, and there is testimony that certain products made by union members and labeled as such were not applied when the serial numbers on the decals indicated that the products were not fabricated by employees entitled to the work under the contract.

Finally the petitioner relies on four other cases involving the same International Union and various of its locals as establishing an illegal pattern of union conduct. Apart from the broad proposition that past misconduct is not conclusive evidence of present guilt, the cases relied upon are clearly distinguishable. Three of them, International Association etc. and Local 24 (Speed-Line Mf'g Co., Inc.,), 137 NLRB 1410 (1962); International Association etc. and Local 125 (Insul-Caustic Corp.), 139 NLRB 659 (1962), and International Association and Local 2 (Speed-Line Mf'g Co. Inc., and Fibrous Glass Products, Inc.,), 139

NLRB, 688 (1962), involved "premolded" fittings, not "prefabricated" ones as in the case at bar. The distinction, as the Board pointed out, is crucial, for prefabricated fittings are essentially hand made and could and customarily had been prepared by members of International's local unions, whereas premolded fittings are factory made with the use of heat and heavy machinery to produce curved or "L" shaped insulation. Neither Thorpe nor Armstrong makes or has the facilities to make premolded fittings. Nor do the members of the locals have the skills to make such fittings. Thus in the cases cited above the Board quite reasonably concluded that in objecting to the use of premolded fittings the unions were not in fact seeking to obtain work claimable under their contracts but instead were objecting to the non-union status of the manufacturers of the premolded fittings.

The fourth case relied upon by the petitioner was decided by the Board subsequent to the case at bar and involved the same parties. Local 22 International Association etc. and Houston Insulation Contractors Association (Mundet Cork Co.), 150 NLRB 156 (1965). In that case members of Local 22 employed by Mundet Cork Co. refused to apply aluminum jacketing supplied by Johns-Manville ostensibly because it did not bear the union decal although in fact it had been made by union labor. The case is a peculiar one but it is readily distinguishable on the trial examiner's finding that the particular aluminum jacketing made by Johns-Manville had never been made and could not have been made by the Mundet employees and hence was not work within the contractual ban on subcontracting.

■ On the law, the petitioner relies primarily upon § 8(e) of the Act quoted in material part in footnote 3, supra. It asserts and we agree that the proviso exempting subcontracting jobsite work in the construction industry does not apply because the Board did not disturb the trial examiner's finding that the mitering and cutting of bands, even when performed by Armstrong and Johns-Manville employees, was performed in their shops and not at the jobsite. But we do not agree with the petitioner that § 8(e) absent its proviso renders the contractual ban on subcontracting unenforcible and void.

■ It is, of course, true that the agreement not to subcontract the work of preparation or application of insulation materials is in a certain sense an agreement whereby the employer agrees to refrain from handling, using or otherwise dealing in the products of another employer, if not also an agreement not to do business with another person. But to hold that a provision in the collective bargaining agreement against subcontracting was void and unenforcible because of its secondary effects would not square with Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L. Ed.2d 233 (1964), in which the Court held that "contracting out" work previously performed by members of an existing bargaining unit was a statutory subject of collective bargaining under § 8(d) of the Act. Section 8(e) was aimed at so-called "hot cargo" agreements whereby a union in effect forced employers to agree in advance not to do business with other employers with whom the union was not in agreement. It was not the congressional purpose to outlaw such traditional and typical activity as seeking to guarantee preservation of work traditionally done by a bargaining unit. NLRB v. Joint Council of Teamsters No. 38, 338 F.2d 23, 28 (C.A.9, 1964), and cases cited. In short, § 8(e) applies only to those agreements which on their face require an employer to cease or refrain from handling, using or otherwise dealing in the products of another employer with whom the union has a dispute. "Primary subcontracting clauses, on the other hand, fall outside the ambit of Section 8(e) * * *." Orange Belt District Council of Painters, No. 48, etc. v. N. L. R. B., 117 U.S.App.D.C. 233, 328 F.2d 534, 537, 538 (1964). An agreement banning the subcontracting of prepara-

tion work such as the one in the case at bar, not being a "hot cargo" agreement or on its face an attempt at a secondary boycott *in futuro*, § 8(e) does not apply.

We agree with the Board's dismissal of the complaint as to Local 22. We do not, however, agree with its dismissal of the complaint as to Local 113.

The problem presented by the refusal of the members of Local 113 to apply the pre-mitered fittings is so far as we know unique. As we have already pointed out Local 113 had no contract with Armstrong, although the Contractors Association of which Armstrong was a member had a contract with Local 22 which provided that members when operating outside the Local's jurisdiction "abide by the rates of pay, rules and working conditions established by collective bargaining agreements between the Local (sic) insulation contractors and the local union in that jurisdiction" and Local 113's bargaining contract in its jurisdiction contained a ban on subcontracting identical with that in Local 22's contract with the Contractors Association. On this basis the Board held that "Whether Local 113 is regarded as a third-party beneficiary of Local 22's bargaining contract or as agent of Local 22 it had the right to insist, in accordance with the terms of the contract, that Armstrong adhere to the lawful no-subcontracting clause." We do not agree.

 The record is clear, as the trial examiner found, that mitering fittings would not have been done by members of Local 113 at the jobsite in Victoria, Texas, but would have been done by members of Local 22 employed by Armstrong at its shop in Houston. Thus the third party beneficiary theory is inapplicable because Local 113 would not have reaped any benefit from Local 22's contract. The agency theory has no factual support in the record. Moreover, we think the question presented by the behavior of Local 113 is not to be framed in terms of principles of the law of contracts or agency, developed in other contexts for other purposes. The fact of the matter is that Local 113 put economic pressure on an employer with whom it had no collective bargaining agreement to secure benefits to employees in another unit, Local 22. The question is whether such action by Local 113 comports with the underlying purposes and objectives of the Act. We think it does not.

 Since Local 113 was not attempting to procure work for its members (they would not have done the mitering anyway) if it was not attempting to force Armstrong to cease and refrain from doing business with Thorpe, it was engaging in a controversy not its own but in Local 22's controversy with Armstrong. No doubt Local 113 had an emotional interest in coming to the aid of its sister local. But it had no economic interest in Local 22's claim of breach of contract. We think an emotional interest is too weak to justify conduct which necessarily has coercive impact on a neutral employer. Even if, strictly speaking, Local 113 was not engaged in a secondary boycott, it was coercing Armstrong not for its own benefit but for the benefit of another local at the expense of a neutral employer. We think the thrust of the Act, particularly § 8(b) (4), as set out in many secondary boycott cases[4] is to require each union to restrict its economic coercion to its own labor disputes and not to use that weapon in aid of another union.

Since we are affirming the order of the Board in part and reversing it in part the basis for the Board's declining to pass on the involvement of the International Union, *i. e.*, its finding that neither local had violated the Act, is destroyed. The case must go back to the Board for decision of the question of the International

---

4. See N.L.R.B. v. Denver Bldg. Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951), in which the Court described the congressional objectives of the Act as " \* \* \* of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."

Union's participation in Local 113's work stoppage.

The Order of the Board is enforced in part and reversed in part, and the case is remanded to the Board for further proceedings consistent with this opinion.