**SEGREST & SONS, INC., a corporation et al., Plaintiffs,**

v.

**UNITED STEEL WORKERS OF AMERICA, DISTRICT 36 et al., Defendants.**

**Civ. A. No. 65–455.**

United States District Court
N. D. Alabama, S. D.
May 16, 1966.

John W. Cooper, Birmingham, Ala., for plaintiffs.

Jerome A. Cooper, of Cooper, Mitch, Johnston & Crawford, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

ALLGOOD, District Judge.

This cause, coming on to be heard, was submitted on the pleadings, the order on the pre-trial hearing, the stipulation of facts entered into by counsel, the further stipulation that the issue of liability should be submitted to the court without the intervention of a jury and that if the issue of liability should be resolved by the court in favor of the plaintiffs, the issue of damages remaining would thereafter be tried to a jury.

After a careful consideration of the above and the briefs of counsel submitted herein, the court proceeds to enter the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The court finds the facts to be as stipulated by the parties.[1]

1. "STIPULATION OF FACTS

"On or about September 1, 1963, Southern Electric Steel Company and defendant United Steel Workers of America executed the agreement which is attached hereto as Exhibit 1, covering the production and maintenance employees of that company's plant. On or about December 1, 1964, those parties executed the supplemental agreement attached hereto as Exhibit 2. Exhibit 2 applied to truck drivers who were members of defendant Union and who previously had been employed by Southern Steel Products, Inc., a wholly owned subsidiary of Southern Electric Steel Company.

"Plaintiffs, on or about April 20, 1962, executed the truck lease and service agreement with Southern Steel Products, Inc., attached hereto as Exhibit 3.

"On or about March 20, 1965, Exhibit 3 was terminated by the parties and is not involved in this lawsuit. At the same time Southern Electric Steel Company elected to terminate Exhibit 2 in accordance with the last paragraph on page 9 of Exhibit 2 and the affected drivers were placed on the extra board of the plant of Southern Electric Steel Company as junior men in seniority.

"On or about March 20, 1965, a truck belonging to plaintiffs and under lease to H. T. Mills appeared at Southern Electric Steel Company's plant for loading. At that time H. T. Mills was not a certificated common carrier but held a permit as a contract carrier. Defendant Union, through its representative, defendant Maurice Allen, asked the Southern Electric Steel Company to comply with Exhibit 2 by either employing a common carrier or by utilizing employees covered by Exhibits 1 and 2 from the bargaining unit who were then either on the extra board working intermittently or not working. In his request of the company so to comply defendant Allen stated that if the company did not comply with

## CONCLUSIONS OF LAW

The court has jurisdiction of this action and the parties thereto.

This action is brought under § 303 of the Labor Management Relations Act [29 U.S.C. § 187][2] for damages sustained as a result of an alleged secondary boycott. The sole issue before the court is whether the conduct complained of is proscribed by the provisions of § 8(b)(4) of the National Labor Relations Act [29 U.S.C. § 158(b)(4)].[3]

The court is of the opinion that the conduct complained of is not so proscribed. While the truck lease and service agreement between the plaintiffs and Southern Steel Products, Inc., was in effect, the plaintiffs' truck drivers were members of the defendant Union and were covered by the supplemental collective bargaining agreement between Southern Electric Steel Company, Inc., and the defendant Union. Paragraph 5(r) of that agreement provided that:

"The Company shall have the option to ship LTL shipments by common carrier, or to load on customers trucks."

■ Thus, during the existence of the lease and the collective bargaining agreement, deliveries were made by the plaintiffs' trucks, which were then driven by members of the defendant Union, except when the Company exercised its option under paragraph 5(r) set out above. It appears, therefore, that by the activity complained of the Union was attempting to recapture jobs which had been held by its members prior to the termination of the truck lease contract. Such an attempt on the part of the Union is a typical primary activity and thus lawful under § 8(b)(4).[4]

---

the terms of the supplemental agreement the Union would feel free to take appropriate steps to enforce the contract. Southern Electric Steel Company assured the Union that it had executed Exhibit 2 in good faith and intended to comply with same. An order was issued to unload the Segrest vehicles and an order was issued not to loan any of Segrest's vehicles except when used by common carrier.

"Thereafter Mills obtained a certificate of public conveyance and necessity to be a common carrier and did transport commodities for Southern Electric Steel Company and Southern Steel Products, Inc.

"On two or three occasions after March 28, 1965, Segrest vehicles were used to transport the commodities from Southern Electric Steel Company while under lease to Arrow Truck Lines, a motor common carrier.

"This the 15th day of March, 1966."

2. "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in § 8(b)(4) of the NLRA, as amended.

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of § 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 73 Stat. 545, 29 U.S.C. § 187 (1964 ed.).

3. § 8(b)(4) of the National Labor Relations Act, as amended, provides, in pertinent part, that:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(B) forcing or requiring any person * * * to cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *" 73 Stat. 525, 29 U.S.C. § 158(b)(4) (1964 ed.).

4. See Meat and Highway Drivers, etc. v. NLRB (1964), 118 U.S.App.D.C. 287, 335 F.2d 709.

Incidental secondary effects of such conduct do not render that conduct illegal.[5] An illegal "object" is something more than a result, even an inevitable result, of a work stoppage for a legitimate reason.[6]

Therefore, this court is of the opinion that the attempt on the part of the defendant Union to regain jobs previously held by its members is a legitimate primary activity and that the conduct complained of is not proscribed by § 8(b)(4).

Morris J. Levy, New York City, for plaintiffs.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant.

---

5. Id.

6. Houston Insulation Contractors Association v. NLRB, (5th Cir. 1966), 357 F.2d 182.