**TEXAS DISTRIBUTORS, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**LOCAL UNION NO. 100, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, et al., Defendants-Appellants, Cross-Appellees.**

No. 77–1070.

United States Court of Appeals, Fifth Circuit.

July 6, 1979.

---

1. Scott was found guilty of violating 18 U.S.C. §§ 371, 1955.

John E. Collins, Irving, Tex., for defendants-appellants, cross-appellees.

Durwood D. Crawford, Dallas, Tex., for plaintiff-appellee, cross-appellant.

Before WISDOM, COLEMAN and RONEY, Circuit Judges.

RONEY, Circuit Judge:

A union here appeals an adverse judgment for damages and attorney's fees in connection with picketing activities which the district court determined to violate the secondary boycott provisions of the National Labor Relations Act, § 8(b)(4), 29 U.S. C.A. § 158(b)(4). By cross-appeal, the employer contends that the court erred in holding that the loss of another contract did not result from unlawful union activity. Deciding that the court properly applied the law and was not clearly erroneous in its findings, we sustain the judgment against both appeal and cross-appeal.

Fully set out in comprehensive findings of fact by the district court, the facts can be briefly stated for purposes of this opinion.

Plaintiff Texas Distributors, Inc. is a mechanical contractor providing plumbing and air conditioning installation services to general contractors in the Dallas, Texas construction industry. Defendant Local Union No. 100, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO, is a labor union whose members perform plumbing and air conditioning services. Defendant Local Union No. 198, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, is a labor union whose members perform carpentry services on construction sites in the Dallas area.

Texas Distributors is an open shop contractor and has never had a collective bargaining agreement with any union. Texas Distributors was working on four projects involving union and non-union contractors. Pickets from Local 100 appeared at all four projects, protesting Texas Distributors' wage scale. Members of several other unions stopped work, and the general contractors eventually ordered Texas Distributors to withdraw from each of the projects. Several telegrams were sent to Local 100 advising it of the situation and requesting a letter similar to one sent in 1971 plainly stating that its picketing was only against Texas Distributors, to no avail.

Local 100 sent Texas Distributors an invitation to attend a meeting of contractors to discuss a contract. Armed with clear evidence of the recognitional intent of the picketing, Texas Distributors filed a charge with the NLRB in March 1974 alleging a violation of § 8(b)(7) of the N.L.R.A., 29 U.S.C.A. § 158(b), which empowers the NLRB to seek injunctive relief if a union pickets for recognition for an unreasonable time not to exceed thirty days. The Regional Director found merit in the complaint but entered into a settlement with Local 100 instead of seeking an injunction. The union agreed to cease picketing for 60 days and to post a notice stating that it would not engage in further recognitional picketing. Texas Distributors opposed the settlement, deeming it inadequate.

As a result of these activities, Texas Distributors brought an action against Local 100, Carpenters Local 198, and three other unions, not parties to this appeal, alleging a violation of N.L.R.A. § 8(b)(4) which prohibits secondary boycotts. Following the trial the district court found that Local 100 and Carpenters Local 198 had engaged in an illegal secondary boycott and awarded con-

sequential damages including attorney's fees for the proceedings before the NLRB in the amount of $5,355.75 jointly and severally and $4,614.43 against Local 100 only. From this decision plaintiff and Locals 100 and 198 appeal, raising three issues: (1) was there a violation of N.L.R.A. § 8(b)(4); (2) was the award of damages for one of the four projects correct; and (3) was the award of attorney's fees proper?

### The § 8(b)(4) Violation

Judge Robert M. Hill has so clearly and succinctly set forth the applicable law in his Conclusions of Law that we copy it here almost verbatim with but few editorial changes, with slight deletion and addition of the controlling decisions.

■ It is an unlawful labor practice under § 8(b)(4) of the N.L.R.A., 29 U.S.C.A. § 158(b)(4), for a labor union to indulge in secondary boycotting practices by inducing a person to refuse to perform any services where an object thereof is to force one employer to cease doing business with another employer or to force an employer to recognize a labor union as the representative of his employees unless such labor union is the legal representative of such employees. *See Connell Construction Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 632, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Local 761, Electrical Workers v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.,* 384 F.2d 101, 104–105 (5th Cir. 1967); *Superior Derrick Corp. v. NLRB,* 273 F.2d 891 (5th Cir. 1960); *Ritchie v. UMW,* 410 F.2d 827, 835 (6th Cir. 1969).

■ Whoever shall be injured in his business or property by reason of unlawful activity under § 8(b)(4) may sue under § 303 of the N.L.R.A., 29 U.S.C.A. § 187(b), for damages and costs suffered.

■ Informational picketing at a common work situs, *i. e.* advising the public that an employer pays wages which are lower than union wages and incurs costs and affords benefits which are less than

incurred by union employers in the area, is lawful. *Superior Derrick Corp. v. NLRB, supra* at 896–897. Since the sign carried by Local 100's pickets in this case conveyed this type of area standard information, the picketing was lawful unless secondary boycotting practices condemned by § 8(b)(4) are also present. If they are, then the picketing is unlawful.

■ The objective of informational picketing is the controlling factor in determining whether such picketing practice is lawful or unlawful. If the objective is to publicize the primary employers' sub-level payment of wages and benefits, it is lawful even though there may be pressures on the primary employers which otherwise would cause the picketing to be unlawful because of its secondary boycott effect. *Ramey Construction Co v. Local 544, Painters,* 472 F.2d 1127 (5th Cir. 1973). But, if *any* object of the picketing is for a purpose condemned by § 8(b)(4) it is unlawful. Thus, where picketing has as an object inducing or encouraging employees of secondary employers to refuse to perform work and thereby to force a secondary employer or neutral person to cease doing business with the primary employer, or where picketing has as an object requiring the primary employer to recognize the non-certified picketing union as the bargaining agent of the primary employer's employees, such picketing is illegal and condemned. *Superior Derrick Corp. v. NLRB, supra. See also Bexar Plumbing Co. v. NLRB,* 536 F.2d 634, 636 (5th Cir. 1976). Should there be "an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take *concerted* action" to quit working behind the picket line in order that a prohibitive secondary effect on the primary employer will occur, such picketing is unlawful. *Superior Derrick Corp. v. NLRB, supra* at 897; *Aircraft & Engine Maintenance & Overhaul Employees, Local 290 v. Oolite Concrete Co.,* 341 F.2d 210, 212 (5th Cir. 1965). The object of common situs picketing, therefore, becomes critical in determining whether § 8(b)(4) has been violated.

One method adopted by the Fifth Circuit and other courts to test the legality of picketing is to apply the standards set out in *Sailor's Union of the Pacific, AFL and Moore Dry Dock Co.,* 92 N.L.R.B. 547 (1950). *Superior Derrick Corp. v. NLRB, supra; Ramey Construction Co. v. Local 544, Painters, supra.* These standards, if met, can insulate the picketing from claims of illegality. To test legality under *Moore Dry Dock,* the court will determine: (1) was the picketing limited to times when the situs of the dispute was located on the secondary employers' premises; (2) at the time of the picketing was the primary employer engaged in its normal business at the situs; (3) was the picketing limited to places reasonably close to the situs; and (4) did the picketing clearly disclose that the dispute was with the primary employer and no one else.

■ Although a union may comply with the *Moore Dry Dock* standards, this is insufficient to conclude that the picketing was not infected with an illegal secondary objective. *See Ramey Construction Co. v. Local 544, Painters, supra* at 1135; *Gulf Coast Building Co. v. International,* 428 F.2d 121, 125 (5th Cir. 1970); *Aircraft & Engine Maintenance & Overhaul Employees, Local 290 v. Oolite Concrete Co., supra.* Indicia of an improper motive in such picketing are (1) the picketing union beforehand makes known to other unions its intent to picket; (2) the picketing union knows that it is the policy of other unions to honor all pickets on the jobsite and not to cross such picket lines; (3) an understanding between a secondary employer and the picketing union that work interruptions will cease if and when a picket is removed; (4) threats, veiled or otherwise, by picketing union that a secondary employer was not using good business judgment in doing business with the primary employer; (5) picketing only at jobsites where other unions are working and not at jobsites where only non-union workers are employed, and where picketing is never done at the primary employer's home office; (6) the failure of a picketer to answer inquiries of others as to the purpose of the picketing. *Bexar Plumbing Co. v.*

*NLRB, supra* at 636; *Ramey Construction Co. v. Local 544, Painters, supra* at 1135; *Gulf Coast Building Co. v. International, supra* at 125.

■ If the normal effect of the picket line causes confusion in the minds of the viewer as to its purpose or if it causes a disruption of work through work stoppages by other unions, the burden is cast on the picketing union to make known to those whose minds are confused or who are honoring the picket lines that it is directed only against the primary employer and no other employer or neutral person. *Superior Derrick Corp. v. NLRB, supra; Teamsters, Local 126,* 81 LRRM 1461, 1466 (1972).

■ Further, a court will look at the totality of the evidence in determining the motive or object of the picketing. *Ramey Construction Co. v. Local 544, Painters, supra.* If neutral persons were misled or encouraged to act as a result of the picketing, the picketing is unlawful.

The union argues that the facts demonstrate its picketing was legal since it was directed at the primary employer and any secondary effects were incidental. It contends the trial court has confused its conduct which arguably may violate a different section of the N.L.R.A., § 8(b)(7) which limits recognitional picketing with § 8(b)(4), which restricts secondary boycotts.

■ The district court, however, made clear findings that the conduct violated § 8(b)(4), with full understanding of the different consequences of a § 8(b)(7) violation. That the activities of the union may also have generated a complaint for improper recognitional picketing under § 8(b)(7), for which no damages would be recoverable, does not foreclose the remedy available when that activity is found to constitute an illegal secondary boycott.

■ The decisive question in a secondary boycott case is whether the intent or object of the union's activity is directed at the primary employer alone or at secondary employers, with the intention of pressuring the latter to curtail business with the pri-

mary employer. *See Local 761, Electrical Workers v. NLRB,* 366 U.S. 667 (1961). The prohibited secondary object need not be the sole object of the union's activity. Indeed, in the ordinary course of things, a union's ultimate goal will be to influence the primary employer. A determination that the union has such an objective does not, as Local 100 suggests, foreclose inquiry into whether a prohibited secondary objective or intent exists, as well. As this Court has stated, "If *any* object of the picketing is to subject the secondary employer to forbidden pressure then the picketing is illegal." *Superior Derrick Corp. v. NLRB,* 273 F.2d 891, 896 (5th Cir. 1960).

 The *Moore Dry Dock* test for distinguishing between a legitimate primary object and the prohibited secondary intent in common situs picketing being properly applied, the conclusion of the trial court that Local 100 had an illegal secondary object is supported by the evidence and not clearly erroneous.

In several respects, the *Moore Dry Dock* standards were not met. As the union concedes, picketing of the Y.M.C.A. project continued after Texas Distributors had withdrawn. Upon the withdrawal of Texas Distributors from the Swiss Avenue project, the union immediately switched signs and directed its picketing against the general contractor. It was not clearly erroneous for the court to conclude that these actions indicated an intent to pressure the secondary employers. Because of the historical pattern of Local 100's activity, the court could well conclude that the activities at the other two projects, so close in time and similar in circumstances, were colored by the same illicit intent. There is some dispute as to whether the sign used adequately disclosed that the picketing was directed solely at Texas Distributors. While it contained such a statement, the lettering was considerably smaller than the rest of the letters and there was testimony that it was illegible.

The union does not meet the requirements of *Superior Derrick* either. The logical conclusion to be drawn from the circumstances is that there was an impression among the construction unions in Dallas that Local 100 intended to create a secondary boycott and that Local 100 itself actively contributed to this impression. The union's agent announced its picketing in advance at a meeting of the building trade unions, for example, stating that it was directed at the job or project. The business agents of two other locals testified that it was their understanding that Local 100's activities centered on the entire job not just Texas Distributors' activities. In addition, the picket twice stated to managers of a secondary employer that the picket could have readily been removed if Texas Distributors signed up with the union. Ascertainment of the object of the picketing was difficult because the pickets had been instructed to refer any questions to the agent who, in turn, referred them to the union's lawyer in a distant town. When one of the general contractors sought to end the shut down of its project, the union proposed a subcontract agreement by which only union subcontractors would be utilized on future projects.

 These facts support a conclusion that the unions were aware of a secondary objective of Local 100. In this light, the refusal of the union to take any affirmative action, such as issuance of a letter stating its limited objectives requested, becomes significant. Moreover, the pressure on the secondary employers points surely to an illicit secondary boycott. Indeed, this is an instance where the union has acted in a manner which it *knows* will have a secondary effect even though it could have acted otherwise without creating such an effect. Doing such an act with such knowledge constitutes a secondary boycott for purposes of § 8(b)(4).

### Damages for the Woodhill Project

 In its findings of fact, the trial court stated that the Ironworker's Union refused to work while the picket was present at the Woodhill Project. Local 100 contends that there is no evidence to support a work stoppage by the Ironworkers.

Local 100 is correct insofar as the Ironworkers are concerned. It is not apparent from the record which unions ceased work. It is clear, however, that there was a work stoppage which seriously impeded the project and which caused the general contractor to remove Texas Distributors from the job. Since damages are sought only from Local 100 for this project, it is irrelevant on appeal which unions ceased working.

### Attorney's Fees

29 U.S.C.A. § 187(b) entitles a person who has been injured as a result of a prohibited secondary boycott to "recover the damages by him sustained and the cost of the suit." This Court has held that damages for unlawful secondary activities include reasonable attorney's fees incurred in effectuating a resumption of work through NLRB proceedings. *Linbeck Construction Corp. v. Ironworkers Local 597*, 547 F.2d 948, 950 (5th Cir.), *cert. denied*, 434 U.S. 955, 98 S.Ct. 480, 54 L.Ed.2d 313 (1977). In the instant case, the trial court awarded Texas Distributors attorney's fees for its activities before the NLRB in seeking a resumption of work.

Local 100 contends that this award should be set aside because the charges filed before the NLRB related to a violation of § 8(b)(7) of the N.L.R.A. which regulates recognitional picketing and not § 8(b)(4). The union contends that there is no direct causal relationship between the secondary activity and the legal action.

The record contains testimony, however, from an experienced labor attorney that the prosecution of the § 8(b)(7) claim instead of the § 8(b)(4) claim would be the course most reasonable calculated to result in prompt Board action. The settlement to which the union promptly agreed is evidence that this judgment was accurate. In a situation such as this case presents, where an employer has a § 8(b)(4) claim and another claim as well and it proceeds before the NLRB on the other claim as the best means to effectuate the resumption of work, the employer is entitled to recover reasonable attorney's fees.

Since the employer was entitled to fees for its complaint before the NLRB, it was also entitled to fees for that part of its legal activity before the Board which opposed the settlement. The trial court was justified in including the fees where the purpose of the opposition was to ensure an effective long term resumption of work. The fact that the picketing began anew after the expiration of the 60-day settlement demonstrates that such opposition was warranted.

For a similar reason, Texas Distributors was entitled to fees for its activity before the Board after the settlement had expired. Even though its attempt to have the NLRB enjoin the picketing was unsuccessful, recovery is not foreclosed. Just because a party loses before the Board, it is not precluded from recovery where a violation of the Act is found to have occurred by the courts. *See Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 110 (5th Cir. 1967).

The union contends that these fees were inappropriate because the pickets had been withdrawn for several days before the NLRB complaint was filed. Although the pickets were withdrawn, Texas Distributors had been removed from the jobsites. Had Texas Distributors returned, there is every likelihood that the picketing would have resumed. To refuse to permit the award because the union had been successful in its prohibited activity would reward the union for effective wrongful activities. *See Refrigeration Contractors, Inc. v. Local 211, United Association of Journeymen*, 501 F.2d 668, 671–672 (5th Cir. 1974).

### Cross-Appeal for Damages on The Heritage Square Project

Texas Distributors had entered an agreement with a Dallas contractor to design the air conditioning system for the Heritage Square project which was to consist of a high and low rise building. The developer of the project, Trammel Crow Companies, and its general contractor, McFadden and Miller, were deeply concerned about the

prospect of a work stoppage on their project. They sought assurances that such a stoppage would not occur. After discussions with Local 100, assurances could not be given. Trammel Crow then decided to cancel the participation of the team of contractors which included Texas Distributors, redesigned the project, and had it built by a union general contractor.

The district court held that Local 100 was not responsible for lost profits on the Heritage Square project basing its decision on two conclusions: (1) the contract between Texas Distributors and Trammel Crow was expressly contingent upon the decision to go ahead with the project and Trammel Crow was absolved from any claim for expenses incurred in drawing up plans; (2) there was insufficient evidence to support the conclusion that Local 100's threat of picketing caused the cancellation of the project.

We think that the mere fact that the contract was contingent cannot absolve the union from liability if it was established that the project would have been undertaken but for the union's § 8(b)(4) secondary boycott violation. A union cannot take advantage of such an arrangement or even the unenforceability of the contract where its wrongful interference has frustrated the contract. *See Leonard Duckworth, Inc. v. Michael L. Field Co.,* 516 F.2d 952, 955 (5th Cir. 1975).

Considering it a rather close call, however, we have carefully examined the trial court's conclusion that "Texas Distributors failed to prove that Local 100's actual or threatened picketing caused the cancellation of the Heritage Square project and the loss of that project by Texas Distributors" and that "the Heritage Square project was cancelled for reasons other than Local 100's threat to picket the project." On appeal, a finding of fact cannot be set aside unless it is shown to be clearly erroneous. Fed.R. Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gyp-*

*sum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Bartelt v. United States,* 505 F.2d 647, 649 (5th Cir. 1974).

This Court does not have that "definite and firm conviction." Texas Distributors had the burden of proof on the issue. In such a case, if the evidence is such that a decision on a point cannot be made one way or the other, the party with the burden of proof loses. The district court thoroughly analyzed the evidence, and it would serve no useful purpose for us to do that here. The district court in this case cannot properly be reversed on the cross-appeal.

AFFIRMED.