**RAMEY CONSTRUCTION COMPANY INC. et al., Plaintiffs-Appellants,**

v.

**LOCAL UNION NO. 544, PAINTERS, DECORATORS AND PAPERHANGERS OF AMERICA and its Officers, Agents and Employees, et al., Defendants-Appellees.**

No. 72-1275.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1973.

John Cosmic, John W. Broadfoot, Amarillo, Tex., for plaintiffs-appellants.

Tom Upchurch, Jr., Amarillo, Tex., Buddy Wright, Fort Worth, Tex., for defendants-appellees.

Before RIVES, THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This appeal involves the legality of common situs picketing conducted by the defendant-union on numerous construction sites in the Amarillo, Texas area. As with all cases of this type, we must accommodate two important yet often sharply conflicting values of national labor law and policy—the right of a union to strike, and the right of a neutral employer to be free of secondary pressures. The court below found that the picketing did not violate the National Labor Relations Act and therefore dismissed plaintiffs' damage claim. We affirm.

This action was initiated by seven general contractors who were overseeing construction at eight different sites in the Amarillo area. At each of these sites there were various subcontractors, including painting subcontractors, and their employees. All of the painting subcontractors, with the exception of one, Ruthart and Williams, were members of the Amarillo chapter of the Painting and Decorating Contractors of America [P.D.C. of A.]. The painter-employees were members of defendant-union, Local 544 of the Painters, Decorators and Paperhangers of America. Local 544 had a contract with the local

chapter of the P.D.C. of A. which covered the painters on the construction sites. Ruthart and Williams had their own independent contract with the union, which apparently was governed by the P.D.C. of A. contract.

The Union-P.D.C. of A. contract expired on September 30, 1970. The parties were unable to agree on a new contract, and on October 1, 1970, the Union called a strike in support of their contract demands. On that day pickets were placed at six of the job sites under contract to the plaintiff-general contractors. On Friday, October 2, the Union picketed two additional job sites, making eight in all. All eight sites were again picketed on Monday, October 5. The picketing proved extremely effective—on each of the three days all of the construction jobs were virtually closed down. Almost all of the other crafts and many of the suppliers honored the painters' picket line even though Local 544's dispute was only with the painting subcontractors and not with the general contractors or other subs. There was no further picketing after October 5th.

On October 28, 1970 plaintiffs, the general contractors on each of the eight picketed sites, filed a petition in district court seeking damages from the Union under § 303 of the N.L.R.A., 29 U.S.C. § 187.[1] The plaintiffs contended that the picketing constituted unlawful secondary pressure under § 8(b)(4)(i)(ii)(B) of the N.L.R.A., 29 U.S.C. § 158(b)(4).[2] After trial, the district court found that each of the plaintiffs had, in fact, suffered financial damage from the picketing. The court found, however, that on seven of the eight sites the picketing was legally conducted and that therefore the Union could not be held liable for the damage.[3] The plaintiffs appeal from this finding, claiming that the court below erred in not finding the picketing violative of § 8(b)(4).

■ The legality of common situs picketing under § 8(b)(4) has been the subject of much litigation in this

1. Section 303 reads:
 "Sec. 303. (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended.
 "(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefore in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

2. Section 8(b)(4) reads in relevant part:
 "Sec. 8
 " . . . .
 "(b) It shall be an unfair labor practice for a labor organization or its agents
 . . . .
 "(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:
 " . . . .
 "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; "

3. The picketing on one site, the Marsh project, was found violative of § 8(b)(4) and damages were assessed. The Union has not appealed from this finding and it is not directly in issue on this appeal.

Circuit[4] and it has always been a most difficult and delicate area.[5] There are, however, certain firm guidelines. First and foremost is the principle that the controlling legal factor is the object or purpose of the picketing and not the effect. As the Supreme Court has said:

> "Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success. . . . But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer."

Local 761 v. N. L. R. B., 1961, 366 U.S. 667, 673–674, 81 S.Ct. 1285, 1289, 6 L. Ed.2d 592, 598. If the *object* of the picketing is to put pressure on the primary employer, it is protected, regardless of the secondary effects. *See, e. g.,* Brown Transport v. N. L. R. B., 5 Cir. 1964, 334 F.2d 30, 37; Construction & General Laborers Local No. 438 v. Hardy Engineering and Construction Co., 5 Cir. 1965, 354 F.2d 24, 27.

■ Second are the more objective criteria, developed by the Board and the courts, that are used in determining whether the union conducted its common situs picketing in a way least calculated to induce secondary effects. The failure of a union to observe these criteria which are primarily embodied in the *Moore Dry Dock*[6] standards, is treated as strongly indicative of a secondary, proscribed object. *See,* N. L. R. B. v. Lafayette Bldg. and Construction Trades Council, 5 Cir. 1971, 445 F.2d 495, 497. The *Moore Dry Dock* standards have been further amplified in this Circuit by a requirement that the picketing union do everything that is reasonably necessary to insure that secondary employees are not misled or coerced into observing the picket line. Initially enunciated in Superior Derrick Corp. v. N. L. R. B., 5 Cir. 1960, 273 F.2d 891, and followed in numerous Fifth Circuit cases, *e. g.* Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446, 456; Brown Transport v. N. L. R. B., *supra*, this requirement places a heavy burden on the picketing union to convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects.

The question of intent is obviously an elusive one in the common situs context. The picketing union will rarely declare openly that it has a secondary objective, so the trier of fact must carefully evaluate the totality of the union's conduct, in light of the established standards, in making a determination of legality. The question is further complicated by the unavoidable reality that the typical union, regardless of its "objective" will rarely, if ever, view with displeasure any secondary effects which do occur despite whatever precautions have been taken. In Houston Insulation Contractors Assoc. v. N. L. R. B., 5 Cir. 1966, 357 F.2d 182, 187, we observed in a similar context:

> "It may well be that the union officials hoped and expected, certainly we may assume that they would not have minded, if a result of their members'

4. N. L. R. B. v. Lafayette Bldg. & Construction Trades Council, 5 Cir. 1971, 445 F.2d 495; Vulcan Materials Co. v. United Steelworkers of America, 5 Cir. 1970, 430 F.2d 446; Aircraft & Engine Maintenance Local 290 v. Oolite Concrete Co., 5 Cir. 1965, 341 F.2d 210; Brown Transport v. N. L. R. B., 5 Cir. 1964, 334 F.2d 30; Burr v. N. L. R. B., 5 Cir. 1963, 321 F.2d 612; Superior Derrick Corp. v. N. L. R. B., 5 Cir. 1960, 273 F.2d 891.

5. *See generally,* Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363 (1962).

6. Sailors' Union of the Pacific, AFL and Moore Dry Dock Co., 92 N.L.R.B. 547 (1950). The *Moore Dry Dock* standards are set out *infra* in the text of this opinion.

refusal to use and apply the bands and fittings was to put pressure on Techalloy and Thorpe as non-union employers. But hopes and expectations do not necessarily constitute 'objects.' An illegal "object" is something more than a result, even an inevitable result, of a work stoppage for a legitimate reason. Otherwise the right to strike would for practical purposes be nullified, a result which Congress clearly did not intend."

Responding to this paradox—that the union invariably desires the proscribed object—the law has defined the quest for illegal "object" in terms of the need to actively prevent secondary effects.

The judicial task, then, in determining whether the proscribed object existed, must be framed chiefly in terms of whether the union's behavior evinces an attitude too solicitous of helpful, secondary pressures. The objective indices of *Moore Dry Dock* and *Superior Derrick* were found satisfied by the court below.

### A. *Moore Dry Dock*

■ In 1950, using the *Moore Dry Dock* case as a vehicle, the Board supplied objective criteria for answering the question of when common situs picketing violates § 8(b)(4). These criteria have been followed in this Circuit, and the failure to comply with *Moore Dry Dock* generally creates a strong but rerebuttable presumption of a proscribed objective. *See*, Local 761 v. N. L. R. B., supra, 366 U.S. at 676–679, 81 S.Ct. 1285, 6 L.Ed.2d 592; *see generally*, Brinker, Common Situs Picketing by Construction Unions since 1958, 23 Lab. L.J. 323 (1972).

■ To test legality, *Moore Dry Dock* looks to whether the following four criteria are present: (1) the picketing is strictly limited to times when the situs

of the dispute is located on the secondary employer's premises; (2) at the time of the picketing the primary employer is engaged in its normal business at the situs; (3) the picketing is limited to places reasonably close to the situs; (4) the picketing discloses clearly that the dispute is with the primary employer.

In the instant case the district court found, after a full trial, that the picketing at seven of the eight sites "was in accord with the requirements of *Moore Dry Dock*." Appellants argue that none of the requirements was met. Their principle objection seems to be that the court below "failed to consider" numerous factual occurrences that allegedly refute the possibility of *Moore Dry Dock compliance*.[7] We reject this contention for two reasons.

■ First, there is absolutely no indication that the trial court did not consider the evidence that appellants claim was ignored. All of the facts were admitted into evidence and the trial court's failure to mention each and every specific item in its memorandum opinion in no way indicates that they were not considered, weighed, and rejected as inconclusive.

■ Second, assuming as we must that these factors were considered, we find that the trial court's factual finding of compliance with each *Moore Dry Dock* factor was not clearly erroneous. Specifically, as to each of the four above-mentioned criteria:

(1) At each of the sites involved in this appeal the picketing took place only when the primary employer was present at the common situs. At the one site where this was not the case, the Marsh project, the court found against the union.

7. Among the facts pointed to by the appellants are: (1) the failure of the union to picket two primary sites where no neutrals were present; (2) the failure of the union to inquire if it could have picketed more closely to the primary sites; (3) the union's changing of its picket signs on the third day to make them clearer; (4) statements by union members and employees that it was expected that neutrals would honor the picket line; (5) the words "on strike" on the picket signs were written in red.

(2) It was stipulated by the parties that the picketing took place from 7:00 a. m. to 5:00 p. m. Although this is a slightly longer period of time than the normal work day for the painters, there was evidence that the painters often arrived early to get ready for work and often left late after cleaning up. For this reason, we are unable to say that a finding that the picketing occurred only while the primary employer was engaged in its normal business at the situs was clearly erroneous.

(3) The trial court found that in "all cases the picketing was as close as could reasonably be expected to the sites of the primary employer." The evidence clearly supports this finding.

(4) The requirement that the primary dispute be clearly disclosed by the pickets is most hotly contested. On the first and second day of picketing, the signs read as follows:

PAINTERS L.U. 544
ON STRIKE
FOR BETTER WAGES
AND
WORKING CONDITIONS
There is no contract between
L.U. 544 & the P.D.C. of A.

The signs were changed for the third day of picketing and on that day they read:

PAINTERS L.U. # 544
ON STRIKE
FOR BETTER WAGES
WORKING CONDITIONS

There is no contract between L.U. # 544 and the Painting and Decorating Contractors of America Amarillo Chapter (. . . name of painting subcontractor . . .). We do not have a dispute with any other employer.

Appellants claim that the signs used the first two days were needlessly con-

fusing, and that the trial court's finding that "the picketing, under the circumstances in this case, clearly disclosed that the dispute was with the primary employers, the painting subcontractors," was clearly erroneous.

■ We have personally viewed the picket signs, included in the record on appeal, and there is merit to the argument that they could have been more precise. But this fact alone is not enough to reverse as clearly erroneous the finding of clear disclosure. Aside from the signs themselves, the trial court had the following evidence before it: (a) Whenever questioned, the strikers either pointed to the signs or clearly told all neutrals that the dispute was only with the P.D.C. of A. *Cf.* Superior Derrick Corp. v. N.L.R.B., *supra;* (b) of the several secondary employees who testified, no one said he was misled in any way, and the reason, if any, given for not crossing the picket line was union "solidarity," not confusion, coercion, or threats; (c) the pickets did not block any entrance or in any way affirmatively encourage secondary work stoppage.[8] *Cf.* N.L.R.B. v. Dallas General Drivers, 5 Cir. 1959, 264 F.2d 642, cert. denied, 361 U.S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61. Further, although not explicitly set out, the record clearly gives rise to a strong inference that the workers on all of the sites knew full well what the signs meant—that the dispute involved only the painters. There is no evidence to the contrary.

With these facts before it, the district court concluded that despite a lack of perfection in the signs themselves, the fourth *Moore Dry Dock* criteria was complied with. The essence of the inquiry is whether the picketing was in any way misleading or ambiguous. A mechanical evaluation of the picket signs is obviously not the end-all of the quest. The pica or the ems of the signs declar-

8. The record does not reveal the existence of multiple gates on any of the sites and therefore none of the usual problems attending "separate gates" are present. *Cf.* Local 761 v. N.L.R.B., *supra;* Markwell & Hartz, Inc. v. N.L.R.B., 5 Cir. 1967, 387 F.2d 79, cert. denied, 1968, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653.

ing the disputants is not decisive. We have no measurable rules or regulations which are per se pernicious or innocent. The conclusion to be drawn from the record is unquestionably a close one, upon which reasonable minds could differ. Under the mandate of Rule 52(a), Fed.R.Civ.P., however, we are here bound by the findings of the district court.

### B. *Superior Derrick*

Demonstrating bare compliance with *Moore Dry Dock* does not, in and of itself, prove that the common situs picketing was not infected with an improper secondary purpose. *See*, Aircraft & Engine Maintenance Local 290 v. Oolite Concrete Co., 5 Cir., 1965, 341 F.2d 210, 211–212. In *Superior Derrick* we reviewed a Board order that enjoined secondary site picketing even though the picket signs involved clearly disclosed the primary nature of the dispute. In affirming the Board's order enjoining the picketing and reversing that part of the order that upheld picketing at another site, we found that in order to show compliance with requirement 4 of *Moore Dry Dock*, a deeper inquiry must be made into the union's purpose.

> "Of course this offers no automatic guide for union picketing at a common situs. By its nature, however, the purpose or intent of the picketing is not something which may be evaluated mechanically. And this is so whether it be by a sign, or a sign legend directing attention to a pamphlet, or a desire to obviate the uncertainties inherent in a recollection of what was orally said in response to oral inquiry."

Superior Derrick v. N.L.R.B., *supra*, 273 F.2d at 895–896.

The picketing in *Superior Derrick* was condemned because although the signs had been clear, the union's behavior, including, *inter alia*, the failure of the picketing workers to elaborate on the nature of the strike when such informa-

tion was requested by neutrals, evidenced a willful failure to discourage secondary effects. The court stated:

> "The activity, including the picket line, must be conducted in such a way that the normal appeal of a picket line is overcome. It must be done so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer."

*Id.*, at 897.

Appellants, basing their argument on *Superior Derrick*, contend that the behavior of the union's picket lines did not measure up to the high burden placed upon it by that case. They urge that the facially confusing nature of the signs, coupled with the failure of the strikers to take affirmative steps to inform the neutrals of the nature of the strike, rendered the strike unlawful. In essence, they read *Superior Derrick* as saying that unless the union actively encourages the secondary employees to cross their picket line, the activity automatically violates § 8(b)(4). This is an overly mechanical application of *Superior Derrick*, and it cannot be accepted.

Section 8(b)(4) explicitly exempts from its proscription "any primary strike or primary picketing." To read *Superior Derrick* as broadly as appellants urge, would, for all practical purposes, render meaningless the right to strike against a primary employer on a common situs. The Supreme Court has more than once protected this right, *e. g.*, Local 761 v. N.L.R.B., *supra;* N.L.R.B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, and the emasculation of the right urged by appellants would be both unwarranted and unprecedented.

█ The lesson of *Superior Derrick* is that if the picketing union does not take sufficient steps to overcome the

normal appeal of its picket line, the objective of common situs picketing will be deemed secondary. The "normal appeal of the picket line" presumably refers to the natural tendency of both the public and other workers to assume that a picket line is striking against the employer on the picketed site. Since a common situs contains more than the primary employer, the duty evolves for the picketing union to make sure that people are not led to believe that the picket line is directed against anyone other than the primary employer. To the extent that the union fails in this task, the "normal appeal of the picket line" has not been overcome and a secondary boycott is the legal conclusion. For example, the failure of the picketers in *Superior Derrick* to answer the neutrals' inquiries resulted in our finding that they knowingly took advantage of the picket-line appeal.

There are no such unequivocal facts in this case that require a reversal of the district court's finding of proper purpose. Here, the evidence is uncontradicted that the picketers, when questioned regarding the nature of the strike generally, responded that it involved only the painters and that neutrals were free to cross. The record is barren of facts showing that anyone was in any way coerced, threatened, encouraged, or misled into not crossing the picket line. Even considering the arguable lack of clarity in the picket signs, there is no evidence whatsoever that any secondary employee honored the defendants' picket line for any reason other than a personal choice to support the painters' strike by withholding their labor. To say that *Superior Derrick* requires a union to affirmatively encourage neutrals to cross its picket line when the evidence indicates that nobody was misled or induced by threats, subtle or otherwise, is to exalt form over substance. The "normal appeal of a picket line" is overcome at a common situs when everyone knows that the strike is directed only at the primary employer, and no neutrals are en-

couraged to honor the line out of anything other than a self-induced sympathy with the strike. The district court's finding that the union did everything that could reasonably be expected towards this end is not clearly erroneous.

### C. *Totality of Evidence*

Finally and in addition to the above arguments, appellants contend that the totality of the evidence requires that a proscribed purpose be found as a matter of law. It is true that even if the more "objective" requirements of *Moore Dry Dock* and *Superior Derrick* are satisfied, if the totality of circumstances unequivocally demonstrates a secondary purpose existed, the picketing should be deemed unlawful. We have carefully examined the record, including the fact that a proscribed purpose was found by the district court at one of the eight construction sites, and we remain firm in our belief that the findings below were not clearly erroneous. We do not believe that a review of all the evidence in this opinion is either necessary or appropriate. Suffice it to say that the record supports a finding that this union (a) had not gone out on strike in many years; (b) placed one or two totally unobstrusive pickets at the only entrance on each of seven construction sites where other men were working; and (c) used picket signs that indicated, albeit less clearly than was possible, that the strike was against only the primary employer. Furthermore, and most important, the conclusion that no neutrals were misled or encouraged by the pickets or the signs is well supported. With these facts before us, a finding of no secondary purpose is not clearly erroneous.

### Conclusion

The fact that the picket line did, in fact, have secondary effects is, as we said earlier, not at all determinative as to its legality. We would be naive if we failed to take judicial notice of the phenomenon that *any* primary picketing

at a common situs, particularly a construction site, has strong secondary potential, regardless of how many precautions are taken. This is the nature of unionism and no matter how one views this phenomenon, it is a fact. As we said in *Superior Derrick:*

> "The primary union may hope that from the publicity other unionists may reach the decision that they as individuals do not wish to work under such circumstances. To this extent the Act affords no insulation against the pressures which might be generated on the primary employer."

273 F.2d at 896–897. Section 8(b)(4) requires only that the picketing be conducted in such a way as to avoid any secondary pressure that might derive from anything other than this independently reached worker solidarity. Under this standard, the record supports the finding that the proscribed purpose did not exist.

 The words "induce or encourage" in their statutory environment are kinetic, and not passive words. This conclusion is ineluctable because common situs picketing is not per se condemned. That the union hoped the picket line would be a mental or moral barricade is a fact of our industrial life and strife which the Congress recognized and accepted as one of the mores of unionization. If Congress had wanted to eliminate common situs picketing it could have done so with a "thou shall not." Instead, the provisions of § 8(b)(4) explicitly protect purely primary activity with incidental secondary effects. A common situs picket that does not coerce, mislead, threaten, or otherwise encourage secondary pressure must be deemed primary, even if it achieves what everyone in candor must concede was its hope—respect for the picket line.

As is often said in these cases, the line between permissible primary picketing and an unlawful secondary boycott is a fine one. It is in the nature of things that in the common situs context the law will never be able to accord total protection both to the right to strike and to the right to be free of secondary pressures. The tests that have been worked out by the Board and courts attempt, as far as is possible, to accommodate these interests. By placing the focus of the inquiry on the purpose and intent of the picketing rather than on its effect, the law has adopted a standard most consistent with the preservation of the spirit of the N.L.R.A. It is regrettable that innocent neutral employers must occasionally suffer damages at the hands of a striking union, as here occurred. But this unfortunate fact cannot, under the N.L.R.A., preclude the right of a union to conduct an otherwise proper strike against its primary employer. This is the mandate of Congress, and it is not our function to modify or overturn this important principle of national labor policy.

The finding of proper "purpose," as with any subjective factual determination made by a trial court, must be given great weight by a reviewing court and, because of the equivocal nature of the facts here, we have relied a great deal on the district court's findings.

Very few cases of this ilk and genre are easy of decision and this case is no exception. We cannot, however, say that the trial court misapplied the crucial and critical criteria, and its factual findings under this criteria are not clearly erroneous.

Affirmed.