[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14573

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 29, 2012
JOHN LEY
CLERK

D. C. Docket No. 05-02938-CV-RWS-1

FIDELITY INTERIOR CONSTRUCTION, INC.
FIDELITY INTERIOR, L.L.C.,

Plaintiffs-Appellees,

versus

THE SOUTHEASTERN CARPENTERS REGIONAL COUNCIL
OF THE UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 29, 2012)

Before BARKETT and PRYOR, Circuit Judges, and BUCKLEW,[*] District Judge.

PRYOR, Circuit Judge:

This appeal by the Southeastern Carpenters Regional Council, a union, presents the question whether a jury was entitled to find that the union had violated the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B), by conducting a secondary boycott of Fidelity Interiors, Inc. At trial, Fidelity, a small construction contractor, presented substantial evidence that the union had picketed neutral general contractors, tenants, property owners, and managers for the purpose of coercing the neutral parties with whom Fidelity worked to stop employing Fidelity. Fidelity also presented evidence that it lost existing and future contracts because the neutral parties cut ties with Fidelity to avoid union picketers who had loudly shouted at persons who crossed picket lines, interfered with entries at construction sites, and disrupted the work of the neutral parties in nearby office buildings. The union argues that the district court abused its discretion when it permitted the jury to consider, as part of the totality of the circumstances, evidence of lawful conduct by the union, and when it refused to instruct the jury that evidence of unlawful picketing at one site cannot support a

_____

[*]Honorable Susan Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

2

finding of unlawful picketing at another site. But the district court did not abuse its discretion when it admitted evidence of conduct of the union, whether lawful or not, and the jury instructions correctly stated the law. The union also argues that the jury wrongfully awarded damages based on speculative assumptions, but the record supports the jury's award of damages. We **AFFIRM** the denial of the motions for a judgment as a matter of law and for a new trial.

## I. BACKGROUND

In 2004, the Southeastern Carpenters Regional Council began an area standards campaign with a budget of $1.2 million to pressure nonunion interior systems contractors in Atlanta into raising the pay and benefits of their employees. In a written summary of its campaign, the union identified Fidelity as a substandard contractor that "simply . . . pick[ed] up too much [] [potential union] work downtown." The union decided "to eliminate the threat to [its] standards posed by Fidelity within 90 days." That strategy included targeting neutral contractors and property managers who employed Fidelity.

The union began its campaign against Fidelity by sending warning letters to neutral contractors, tenants, property owners, and managers with whom Fidelity worked, as well as to businesses with whom the neutral parties contracted. In these letters, the union warned the neutral third parties that its campaign against

Fidelity "encompasse[d] all parties associated with projects . . . where Fidelity Construction Inc. is employed." The union explained that its "campaign include[d] highly visible lawful banner displays, demonstrations, and distribution of handbills at job sites and premises of property owners, developers, general contractors, and other firms involved with projects where Fidelity Interior Construction Inc. [was] employed." The union attached a copy of a leaflet, a document entitled "Instructions for Picketers," and a list of "certified area standard contractors."

After the union sent these warning letters, the union picketed the Emory Crawford Long Hospital construction site, where general contractor Warren Hanks employed Fidelity. According to an organizing report by the union, the union chose to "hit [Emory] hard and fast" because "the prestigious Emory hospital would probably not want demonstrators outside their building." At least 130 picketers confronted patients and visitors of the hospital and shouted "Rat!" and "Stop the Rats!" at those who crossed the picket line. The picketers carried signs with the slogans "Maintain Area Standards for Carpenters," and "Fidelity Stop Lowering Area Standards for Carpenters," and erected a large banner that stated "Shame on Emory."

The owner of Emory asked Warren Hanks to remove Fidelity from the job. Warren Hanks removed Fidelity from the hospital until the pickets subsided, and employed a union contractor temporarily. Fidelity was brought back to finish the job two days later.

The union also threatened to picket a construction site at the Proscenium building, where Warren Hanks employed Fidelity. When Warren Hanks informed Steve Shelton, the director of special projects for the union, that it had employed Fidelity in good faith with the understanding that the Proscenium building was outside the target area of the union, Shelton refused to cancel the pickets because, in Shelton's words, Warren Hanks knew the union "had a problem with Fidelity." After the union continued to threaten picketing, Warren Hanks permanently removed Fidelity from the project at the Proscenium building. Eventually, Shelton and Shelton's successor, Chris Freitag, told Warren Hanks that the union would cease picketing construction sites only if Warren Hanks cut all ties with Fidelity. Gene Warren testified that he and his business partner "threw up their hands" and stopped hiring Fidelity because they feared the picketers would drive their clients away.

The union also picketed sites where Choate Construction performed work. According to an organizing report by the union, in 2004, between 20 and 40 union

picketers "hammer[ed]" the Centergy building, where Fidelity worked on a project for Choate. The picketers marched, chanted "Rats out!," used noisemakers, and carried signs, ninety percent of which read "Maintain Area Standards for Carpenters," and ten percent of which read "Fidelity Stop Lowering Area Standards for Carpenters." Although Choate provided a separate gate for workers of Fidelity, the union refused to picket or demonstrate there. Freitag explained that pickets at the separate gate "would [have] be[en] a waste of time" because the gate was not "visible" and "our message would not get to the public." Several picketers distributed handbills and erected a banner far away from the separate gate.

After Choate refused to remove Fidelity from the project at the Centergy building, the union sent representatives to Monarch Plaza, where Choate, but not Fidelity, worked on a project for Reynold's Plantation. The union representatives erected a banner that read "Shame on Reynold's Plantation," distributed handbills, and chanted. When Choate executive, Joe Lain, asked Freitag about the union activity, Freitag told Lain that the "mission [of the union] extended beyond Fidelity[,] it was also to put pressure on people who used Fidelity because this is how [the union] would try to force Fidelity into doing what they wanted them to do." Lain asked Freitag to stop the demonstrations at Monarch Plaza, but Freitag

refused and told Lain that the union would go wherever Choate went and pressure Choate until it ceased its business relationship with Fidelity.

After Choate defied union warnings and hired Fidelity to work on a project for its client, the architectural firm Jova Daniels Busby, the union sent at least 30 picketers to the construction site at Colony Square. When potential patrons attempted to cross the picket line to eat lunch at Shout, a restaurant located inside Colony Square, the picketers screamed "Rats out!," "There [are] rats in the building!," and "Bitch rat!" To stop the pickets, Choate permanently removed Fidelity from the Colony Square project.

The union also picketed at the headquarters of Jova Daniels Busby. For at least five consecutive days, the picketers chanted so loudly that employees of the architectural firm could not conduct meetings in a conference room located inside the building. The union carried a banner directed at the architectural firm alone.

To prevent more pickets, Choate removed Fidelity from other construction sites. Fidelity started a project for Choate at the CNN Center, but Choate removed Fidelity before it finished the job because Choate executives feared pickets. Choate also had invited Fidelity to a kickoff meeting to discuss a new interior drywall project for an important client, Hartford, but Choate revoked the offer

based on its fear that picketers would appear at the project site. Eventually, Choate ceased hiring Fidelity to work on projects in downtown Atlanta.

In 2005, the union threatened to picket a client of Hammerlund Construction, Dr. Mills, after the union learned that Hammerlund had awarded Fidelity drywall work for Dr. Mills. Concerned that "there was going to be instant chaos in front of his doors" if picketers showed up, Dr. Mills told Hammerlund that he might have to take both Hammerlund and Fidelity off the project. Hammerlund proposed that Fidelity work at night, when patients would not be there if picketing occurred. Dr. Mills accepted the proposal.

Although Fidelity finished the job, its relationship with Hammerlund rapidly deteriorated. Before the union targeted Dr. Mills, Hammerlund subcontracted all of its drywall work to Fidelity. In the wake of the threats to picket Dr. Mills, Hammerlund significantly decreased its reliance on Fidelity.

Fidelity also lost business with Griffin Construction in Peachtree Center. The union picketed in front of Peachtree Center until a separate gate was created. The picketers eventually moved to the separate gate, where they blocked deliveries and entry into the building. The property manager of Peachtree Center, Robert Nichols, asked the union what he could do to stop the pickets, and the union gave him a list of contractors whom he should not hire. Nichols asked Griffin

8

Construction to remove Fidelity, and the union credited Nichols for hiring union workers to complete the job.

The union bragged in a written summary of its campaign that its efforts to "eliminate[] [Fidelity] as a threat to [the Atlanta] area" had proved successful. As a result of union protests, Fidelity had been removed from three jobs in one week, and several contractors and property owners, including Warren Hanks, had agreed never to use Fidelity again. The union boasted that Fidelity had "laid off most [of its] employees." Before the union began its campaign, Fidelity employed between 50 and 55 employees, but by 2005, Fidelity employed only 30 of them. By 2008, only 12 employees remained.

Fidelity filed a complaint alleging that the union had violated section 8(b)(4)(ii) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii). Fidelity alleged that the union had intended to coerce Fidelity employees into joining a union, 29 U.S.C. § 158(b)(4)(ii)(A), and neutral employers of Fidelity into firing or refusing to hire Fidelity, id. § 158(b)(4)(ii)(B). The union moved to exclude evidence of banners, handbills, threats to picket, and threats to banner as evidence of unlawful conduct. The district court granted the motion to exclude evidence of banners and handbills as evidence of unlawful conduct, but denied the motion to exclude evidence of threats to picket or threats to banner.

9

At trial, the union maintained that it had picketed at the headquarters of Jova because it had a primary labor dispute with that firm that did not concern Choate or Fidelity, but Fidelity presented three forms of evidence to suggest that the primary target of the picketing was Choate. First, Fidelity introduced a video of the picket at the headquarters of Jova, which was dated before the union filed its unfair labor practice charge against Jova. Second, the union withdrew the unfair labor practice charge against Jova soon after the union filed it. Third, Freitag acknowledged, on cross-examination, that a "tactic" of the union was to file an unfair labor practice charge so that its members could picket.

The union proposed that the district court instruct the jury to give separate consideration to claims based on conduct directed at separate neutral parties and at different construction sites and not consider evidence of unlawful intent at one construction site as evidence of unlawful intent at another site. The district court agreed to instruct the jury to give separate consideration to claims based on conduct directed at separate secondary parties, but the district court refused to instruct the jury that it could not consider evidence of unlawful intent at one construction site as evidence of unlawful intent at another construction site.

The union also requested that the district court instruct the jury to disregard evidence of handbills, banners, and threats to picket as evidence of its unlawful

10

intent. The district court instructed the jury that it could award damages based only on unlawful conduct, but it also instructed the jury that it could consider lawful conduct by the union to determine the objectives of the picketing by the union:

> The use of banners and peaceful distribution of handbills that do not involve patrolling or picketing are protected by the First Amendment and are not themselves unlawful. Likewise sending letters to third parties seeking their aid in a labor dispute, even if the letters warned that the union plans to engage in lawful protest, is also protected speech and not itself unlawful.

> However, while these activities are not themselves unlawful, they may be considered by you as a part of the totality of the circumstances that you review in your analysis of the objectives of the Council's picketing.

> . . . .

> . . . . You may only award damages to plaintiffs proximately caused by unlawful conduct of the Council. Plaintiffs are not entitled to compensation for losses which resulted from the Council's lawful conduct.

Fidelity complained that it lost $31,426 from eight jobs where the union picketed, and estimated that it lost future profits from jobs that it would have performed had the union not coerced neutral employers. In support of its estimation of lost future profits, Fidelity provided evidence about the amount of work Choate and Warren Hanks awarded to other subcontractors between 2005 and 2007. Although Fidelity did not provide evidence about the amount of work

11

Hammerlund awarded to other contractors between 2005 and 2007, Fidelity presented evidence that Hammerlund had used Fidelity exclusively for all of its drywall subcontract work until Hammerlund received picketing threats from the union. Many contractors testified on behalf of Fidelity and stated that they were satisfied with the quality of the work performed by Fidelity. Executives from Warren Hanks and Choate testified that they would have invited Fidelity to bid on projects, but for the incessant threats of the union. Fidelity also presented its work history with various contractors as evidence of contracts lost from the pickets. Fidelity also presented its historic profit margins as evidence of its lost future profits.

The jury returned a verdict against the union. Although the jury rejected the theory that the union had intended to coerce Fidelity employees into joining the union, the jury found that the union had conducted a secondary boycott of Fidelity. The jury awarded Fidelity $1.7 million in damages. The union moved for judgment as a matter of law or, in the alternative, for a new trial. The district court denied the motions and ruled that its jury instructions correctly stated the law, and that Fidelity had presented enough evidence at trial to permit the jury to infer that its calculation of lost profits was a "reasonable approximation of the actual injury

12

sustained." See Am. Bridge Div., U.S. Steel Corp. v. IUOE Local 487, 772 F.2d 1547, 1552 (11th Cir. 1985).

## II. STANDARDS OF REVIEW

Several standards govern our review of this appeal. We review a ruling by the district court on the admissibility of evidence for an abuse of discretion. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1276 (11th Cir. 2008). An abuse of discretion arises when the decision of the district court "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue." United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006) (citations and internal quotations omitted). "We review a district court's rejection of a proposed jury instruction for an abuse of discretion." United States v. Webb, 655 F.3d 1238, 1249 n.8 (11th Cir. 2011). "The district court has broad discretion in formulating jury instructions as long as those instructions are a correct statement of the law." Id. (internal quotation marks omitted). "We will reverse the district court's refusal to incorporate a requested jury instruction only if the proffered instruction was substantially correct, the requested instruction was not addressed in the charges actually given, and failure to give the instruction seriously impaired the

13

defendant's ability to present an effective defense." Id. (internal quotation marks omitted). "We review the legal correctness of a jury instruction de novo, but defer on questions of phrasing absent an abuse of discretion." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citation omitted). "Jury instructions are subject to harmless error review." Webb, 655 F.3d at 1249 n.8. "A motion for judgment as a matter of law may be granted only if after examining all evidence in a light most favorable to the non-moving party we determine there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1287 (11th Cir. 2011) (internal quotation marks omitted). We may reverse the decision of the district court to refuse to order a new trial only if the district court abused its discretion. Id. "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." Id. We review the "size of the damages verdict" for "clear error." Bravo v. United States, 532 F.3d 1154, 1160 (11th Cir. 2008).

### III. DISCUSSION

The Labor Management Relations Act creates a cause of action for those injured by "unfair labor practices" to recover "the damages . . . sustained and the cost of the suit." See 29 U.S.C. § 187. An "unfair labor practice" includes a

14

secondary boycott, which is conduct that "threaten[s], coerce[s], or restrain[s] any person engaged in commerce" with the purpose "to forc[e] or requir[e] any person to cease . . . doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B); see Superior Derrick Corp. v. NLRB, 273 F.2d 891, 896 (5th Cir. 1960). In determining whether a union has conducted a secondary boycott prohibited by section 158(b)(4)(ii)(B), we consider the conduct and the intent of the union.

Although the First Amendment protects picketing in other contexts, see e.g., Snyder v. Phelps, 131 S. Ct. 1207 (2011), the First Amendment offers no refuge to unfair labor practices, which include secondary boycotts marked by coercive picketing with unlawful intent, see, e.g., NLRB v. Retail Store Emps. Union, Local 1001, 447 U.S. 607, 611–616, 100 S. Ct. 2372, 2376–78 (1980). Although peaceful handbilling without other action is not picketing, the "existence of placards on sticks is not a prerequisite to a finding that a union engaged in picketing." Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15, 418 F.3d 1259, 1265 (11th Cir. 2005). The intent of a union is unlawful when its "conduct is calculated to force the secondary employer to cease doing business with the primary employer." Kentov, 418 F.3d at 1263. "If any object of the picketing is to subject the secondary employer to forbidden pressure then the picketing is

15

illegal. It need not be the sole or even main purpose." Superior Derrick, 273 F.2d at 896 (citations omitted).

The union argues that it is entitled to judgment as a matter of law or a new trial on three grounds. First, the union argues that the district court abused its discretion when it admitted evidence of lawful conduct by the union and later misstated the law in its instructions to the jury. Second, the union argues that the evidence is insufficient to prove that it picketed with unlawful intent. Third, the union challenges the award of damages as too speculative. We consider each of these arguments in turn.

*A. The District Court Admitted Relevant Evidence of Union Conduct and Correctly Instructed the Jury About that Conduct.*

The union argues that the district court erred in two ways when it instructed the jury about how to determine whether the union had picketed with unlawful intent. First, the union argues that the district court erred when it admitted evidence of lawful conduct by the union and later instructed the jury that it could consider that lawful conduct in determining the objectives of the picketing by the union. Second, the union contends that the district court erred when it refused to instruct the jury that it could not consider evidence of unlawful intent at one job site as evidence of unlawful intent at another job site. These arguments fail.

16

Fact-finders may examine the entire course of conduct of a union to determine whether its actions were coercive. See, e.g., Ramey Constr. Co., Inc. v. Local Union No. 544, Painters, Decorators, & Paperhangers of Am., 472 F.2d 1127, 1135 (5th Cir. 1973); see also Brown & Root, Inc. v. La. State AFL-CIO, 10 F.3d 316, 322 (5th Cir. 1994). Although some forms of conduct like peaceful handbilling are not coercive within the meaning of the Act, see, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 588, 108 S. Ct. 1392, 1404 (1998), the jury may consider the content of handbills, warning letters, banners, and threats to picket to determine whether the union intended to enmesh neutral employers in its dispute with the primary employer. See, e.g., Int'l Union of Operating Eng'rs, Local 150 v. NLRB, 47 F.3d 218, 224 (7th Cir. 1995); Great Coastal Express, Inc v. Int'l Bd. of Teamsters, Chauffers, Warehousemen and Helpers of Am., 511 F.2d 839, 843–44 (4th Cir. 1975); Serv. Emps. Int'l Union Local 87, 312 N.L.R.B. 715, 745 (1993). Often the content of handbills, banners, and warning letters, "when evaluated in light of . . . [the] entire campaign strategy and conduct [of a union] offer[s] telling evidence of secondary intent." Serv. Emps. Int'l Union Local 525, 329 N.L.R.B. 638, 682 (1999).

The district court correctly allowed the jury to consider all of the conduct by the union to determine whether it had engaged in unlawful activity. The district

17

court did not abuse its discretion when it admitted evidence of lawful conduct by the union. Contrary to the argument of the union that the district court denied its motion to exclude evidence of bannering and handbilling as evidence of unlawful conduct, the record establishes that the district court granted that motion. Although the district court denied the motion of the union to exclude evidence of threats to picket and threats to banner as evidence of unlawful conduct, the district court instructed the jury that it could not award damages for lawful conduct. The district court also did not err when it instructed the jury that it could consider evidence of lawful conduct in determining the objectives of the picketing by the union.

The union relies on our decision <u>Ramey</u> to support its argument that juries may not consider evidence of unlawful intent at one job site as evidence of unlawful intent at another job site, but the union misunderstands that decision. In <u>Ramey</u>, we affirmed a finding that no illegal picketing had occurred at seven of eight different job sites after we examined the "totality of [the] evidence," which "includ[ed] the fact that a proscribed purpose was found by the district court at one of the eight construction sites." 472 F.2d at 1135 (emphasis added). Although <u>Ramey</u> supports the proposition that a jury is entitled to find that evidence of unlawful intent at one job site does not support a finding of unlawful intent at

18

another job site, id. at 1136, Ramey says nothing about instructing a jury that it is not entitled to find that evidence of unlawful intent at one job site supports a finding of unlawful intent at another job site.

The district court did not abuse its discretion when it refused to instruct the jury that it could not consider evidence of unlawful intent at one job site as evidence of unlawful intent at another job site. The district court, as requested by the union, instructed the jury to consider separately the claims about conduct directed at separate secondary parties. The district court also instructed the jury that an award of damages had to be based on unlawful conduct. When we consider the instructions as a whole, the refusal of the district court to instruct the jury that it could not consider evidence of unlawful intent at one job site as evidence of unlawful intent at another job site did not "seriously impair[] the [] ability [of the union] to present an effective defense." Webb, 655 F.3d at 1249 n.8.

*B. Sufficient Evidence Supports the Finding that the Union Picketed with an Unlawful Purpose.*

The union argues that it is entitled to judgment as a matter of law or a new trial because there is no evidence that it picketed with an unlawful intent. The union contends that its goal was to "get contractors to . . . raise the pay scale of

19

non-area standards contractors to the level of 'union scale,'" and the union contends that it did not intend to enmesh neutral employers in its dispute with Fidelity. We have carefully examined the record, and the record supports the verdict of the jury. The district court did not err when it denied the motions of the union for a judgment as a matter of law or for a new trial.

We have considered three standards for determining whether a union pickets with an unlawful intent when a union pickets a common situs where both primary employers and neutral secondary employers work. First, we have considered whether the picketing conforms to the standards established in Sailors' Union of the Pacific, AFL and Moore Dry Dock Co., 92 N.L.R.B. 547, 549 (1950). See Ramey, 472 F.2d at 1131–32. Second, we have considered whether the union failed to discourage secondary effects. Id. at 1134. Third, we have considered the "totality of the circumstances" and have asked whether the union intended to enmesh neutral secondary parties in its dispute with the primary employer. Id. at 1135. In considering the totality of the circumstances, we have asked whether one of the objectives of the union "was to cause [neutral secondary parties] to cease doing business with [the primary employer] or to force [the primary employer] to go out of business, notwithstanding the fact that the picketing had other, lawful objects." Bexar Plumbing v. NLRB, 536 F.2d 634, 636 (5th Cir. 1976). Under all

20

of these standards, the evidence establishes that the union picketed with an unlawful intent.

1. The Picketing Did Not Conform to the <u>Moore Dry Dock</u> Standards.

The evidence establishes that the union exceeded the bounds of lawful picketing. To be lawful, under <u>Moore Dry Dock</u>, picketing must be limited to times when the primary employer is located on the premises, occur when the primary employer is engaged in his normal business at the situs where the primary employer is working, take place reasonably close to the situs, and clearly disclose that the dispute is with only the primary employer. <u>Ramey</u>, 472 F.2d at 1132. Fidelity presented ample evidence at trial that the union failed to comply with these standards, and "[t]he failure to comply with <u>Moore Dry Dock</u> standards generally creates a strong . . . presumption of a proscribed objective." <u>Id.</u>

Fidelity presented evidence that the union twice picketed neutral employers at construction sites where Fidelity was not even present. On one occasion, the union picketed at Monarch Plaza, where the union chanted, erected banners, and distributed fliers critical of Choate. During the picketing, union representative Freitag admitted that the mission of the union extended beyond Fidelity and that the union would pressure companies who employed Fidelity. On another occasion, the union picketed at the headquarters of Jova Daniels Busby. The

21

union argues that Jova was the primary target of the picketing as evidenced by the unfair labor practice charge that the union had filed against Jova, but Fidelity introduced evidence that the charge was a sham designed to allow the union to picket Choate without running afoul of the Moore Dry Dock standards.

Fidelity also introduced evidence that the union failed to disclose clearly that its dispute was with Fidelity, not the neutral secondary employers. To satisfy the Moore Dry Dock standards, "the picketing union [must] make sure that people are not led to believe that the picket line is directed against anyone other than the primary employer." Ramey, 472 F.2d at 1135; see also Superior Derrick , 273 F.2d at 895–96. "If the normal effect of the picket line causes confusion in the minds of the viewer as to its purpose . . . the burden is . . . on the picketing union to make known . . . that it is directed only against the primary employer and no other employer or neutral person." Tex. Distribs., Inc. v. Local Union, No. 100, 598 F.2d 393, 399 (5th Cir. 1979). The union failed to ensure that those who viewed its picketing understood that its primary dispute was with Fidelity, not the neutral employers. The vast majority of signs at many of the construction sites referred only to the neutral employer. The picketers' chants and banners also often referred to the neutral parties, but not Fidelity. The jury was entitled to find

22

that the union picketed with an unlawful intent because the picketing did not conform to the Moore Dry Dock standards.

### 2. The Union Failed to Discourage Secondary Effects.

At trial, Fidelity presented evidence that the union did nothing to lessen disruptions to third parties. "Demonstrating bare compliance with Moore Dry Dock does not, in and of itself, prove that the common situs picketing was not infected with an improper secondary purpose." Ramey, 472 F.2d at 1134. The union shoulders a "heavy burden" and must "convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects." Id. at 1131. On more than one occasion, the union used in excess of 100 picketers and encouraged those picketers to scream and make as much noise as possible. At the headquarters of Jova, the chants disrupted office workers for days. At the Colony Square site, the picketers disturbed patrons of a restaurant located on the construction site by screaming "Rats out!," "There are rats in the building!," and "Bitch rat!" In its organizing report, the union bragged that at Colony Square it "created such a nasty environment, that some complaints to the property owners included people who couldn't work on the 22nd floor because of the noise, tenants could hear our chants in their sleep, and people refused to eat lunch at the mall because they had no choice but to walk through the pickets." The jury was

23

entitled to find that the union picketed with an unlawful intent because the union did nothing to discourage secondary effects.

### 3. The Totality of the Circumstances Suggests that the Union Picketed with an Unlawful Purpose.

"Even if the more 'objective' requirements of Moore Dry Dock and Superior Derrick are satisfied, if the totality of the circumstances unequivocally [sic] demonstrates a secondary purpose existed, the picketing should be deemed unlawful." Ramey, 472 F.2d at 1135. In determining whether the totality of the circumstances establishes that a union picketed with unlawful intent, we consider "threats, veiled or otherwise, by [a] picketing union that a secondary employer was not using good business judgment in doing business with the primary employer." Texas Distribs., 598 F.2d at 399. We consider also whether "neutral persons were misled or encouraged to act as a result of the picketing." Id.

Fidelity submitted ample evidence that the union picketed with an unlawful purpose when the union threatened to picket or continued to picket neutral employers until they promised to stop working with Fidelity. The union does not deny that Freitag said that picketing would not cease at Warren Hanks sites until Warren Hanks ended its business relationship with Fidelity. Nor does the union deny that Freitag stated that the union would follow Choate and exert pressure on

24

Choate until it ended its business relationship with Fidelity. The union also fails to controvert that its representatives told the property manager of Peachtree Center, Robert Nichols, that the union would end pickets there if Nichols employed union contractors.

Fidelity also introduced the warning letters as evidence that the union intended to enmesh neutral employers in its dispute with Fidelity. In these letters, the union warned the neutral employers that its campaign against Fidelity "encompasse[d] all parties associated with projects where Fidelity Construction Inc. is employed." These letters stated that recipients would have an "adversarial relationship" with the union if they did business with Fidelity and encouraged recipients to do business with "certified area standards contractors." It is sometimes said that a picture is worth a thousand words, so the union also sent the neutrals a handbill depicting a rat nibbling an American flag with the phrase "Shame on [Secondary Employer] for the Desecration of the American Way of Life," and a document entitled "Instructions for Picketers."

At trial, the evidence established that the union had, if anything, touted its wrongdoing. Freitag conceded that the success of the union resulted from coercive picketing: "the union's success is not because the contractors have a change of heart all of a sudden, it's because they don't want a hundred of us in

25

front of their building." The totality of the evidence established that the union picketed with the purpose "to force or require . . . [a] secondary employer [to] cease doing business with [Fidelity]," Superior Derrick, 273 F.2d at 896.

## C. The Record Supports the Damages Award.

The union challenges the damages award on three grounds. First, the union alleges that the jury awarded damages based on lawful conduct. Second, the union argues that, even if Fidelity is entitled to $31,426 in lost profits from jobs that it was not permitted to finish because of the picketing, Fidelity is not entitled damages based on lost opportunities to bid. Third, the union alleges that it is entitled to a new trial because the damages were based on too many unsubstantiated assumptions. These arguments fail.

### 1. The Union Fails to Establish that the Jury Based Any Part of its Damage Award on Lawful Conduct.

The union speculates that the jury ignored the jury instructions, but the record refutes its conjecture. In the light of the Supreme Court rule that lawful conduct "cannot provide the basis for a damages award," NAACP v. Claiborne Hardware, 458 U.S. 886, 933, 102 S. Ct. 3409, 3436 (1982), the district court carefully instructed the jury to award damages for unlawful conduct only. Despite the strong presumption that juries follow instructions, see United States v. Stone, 9

26

F.3d 934, 938 (11th Cir. 1993), the union speculates that the jury based part of its damage award on lawful conduct. The union alleges that a Fidelity representative admitted that Choate revoked its offer of employment for the Hartford project because the union had lawfully erected banners and distributed handbills at another Choate construction site at Philadelphia College, but the union ignores the testimony of Choate executive, Steele Fortune, that he had revoked the offer on the Hartford project because he had feared that the union would engage in unlawful pickets at the construction site. Fortune's fear of picketing was reasonable because the union had already sent picketers to Choate construction sites and had threatened to follow Choate wherever it went so long as it continued to employ Fidelity.

2. The Jury May Award Damages for Lost Opportunities to Bid.

The union argues that damages for lost business opportunities are unavailable under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187(b), but the text of that statute suggests otherwise. Section 303 provides that any person injured by certain unfair labor practices may sue in state or federal court to recover "the damages by him sustained and the cost of the suit." 29 U.S.C. § 187(b). "In assessing [the meaning] of the word 'damages' in § 303(b) we begin with the fundamental canon of statutory construction that, unless

27

otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Summit Valley Indus. v. United Bhd. of Carpenters & Joiners, 456 U.S. 717, 722, 102 S. Ct. 2112, 2115 (1982) (internal quotations omitted). The ordinary meaning of the term "damages" includes "actual, compensatory damages." See Local 20, Teamsters, Chauffeurs, & Helpers Union v. Morton, 377 U.S. 252, 260, 84 S. Ct. 1253, 1259 (1964). Unlike punitive damages, compensatory damages "indemnify the injured person for the loss suffered." Black's Law Dictionary 445 (9th ed. 2009). Because Fidelity suffered an actual loss—the neutral employers ceased asking Fidelity to bid on projects that otherwise would have been awarded to Fidelity—Fidelity is entitled to recover damages for lost opportunities to bid under section 303.

The union ignores the text of section 303 and misreads Matson Plastering Co. v. Plasterers & Shophands Local No. 66, 852 F.2d 1200 (9th Cir. 1988), to support its argument that Fidelity is not entitled to damages under section 303. Matson Plastering appealed from a judgment in favor of a union where the district court had assumed, for the sake of argument, that the union had engaged in illegal picketing activities, but concluded that section 303 afforded Matson Plastering no remedy. Id. at 1202. The Ninth Circuit affirmed and stated, "Because Matson did not bid on . . . subsequent contracts, we hold that any damages resulting from its

28

lost opportunities are not available under section 303." Id. at 1203. Matson differs from this appeal because Fidelity presented evidence that it was not even invited to bid on contracts because of the illegal pickets of the union.

We reject the argument of the union that damages based on lost opportunities are too speculative as a matter of law. "The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S. Ct 248, 250 (1931) The phrase "contingent and uncertain" "embraces . . . such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount." Id. In other words, so long as a plaintiff can prove that it has suffered some injury to its business, mathematical precision in proving the amount of damages is unnecessary. See, e.g., George E. Hoffman & Sons, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, & Helpers of Am., 617 F.2d 1234, 1247 (7th Cir. 1980).

Fidelity proved the fact of its damages. "The fact of damage is made out upon proof that the plaintiff's level of profits . . . is . . . less than it otherwise would have been absent some intervening cause." Alan's of Atlanta, Inc. v. Minolta Co., 903 F.2d 1414, 1426 (11th Cir. 1990). At trial, contractors testified

29

that they would have continued to award Fidelity work absent the fear of future pickets. Because Fidelity proved that it would have earned more profits but for the picketing, the jury was entitled to award it damages based on lost opportunities to bid.

A categorical rule against recovery for damages based on lost opportunities to bid would eviscerate the secondary boycott law. If primary employers cannot recover damages for lost opportunities to bid, unions will have every incentive to engage in secondary boycotts because the unions ordinarily will suffer, at most, minimal financial liability, no matter how strong the proof of greater injury. As Fidelity persuasively argues, "This . . . go[es] beyond the Union's alleged desire to . . . 'level the playing field'; this is the blatant elimination of competition."

3. The Evidence in Support of the Damages Award Was Sufficient.

We also reject the argument of the union that Fidelity failed to present sufficient evidence to support its claim of lost future profits. The evidence Fidelity presented was not too speculative; "proof of the amount [of damages] can be an estimate, uncertain, or inexact." Mid-Am. Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1367 (7th Cir. 1996) (quoting Robert L. Dunn, Recovery of Damages for Lost Profits § 1.3 at 11). Fidelity submitted evidence of the drywall

work that Choate and Warren Hanks subcontracted to other companies in 2005, 2006, 2007, and 2008. Many general contractors testified that they were satisfied with the work performed by Fidelity, and at least two of these contractors testified that they would have invited Fidelity to bid on their projects had the union not picketed. Fidelity also presented evidence about the percentage of drywall subcontract work that it had historically performed for various contractors and its historic profit margin, which provided a basis for the jury to infer that Fidelity would have continued to perform and profit from approximately the same proportion of drywall work as it had in the past. Ultimately, any "uncertainty as to the damages stems from the . . . illegal conduct [of the union], . . . [and] the [union] should not benefit from the uncertainty [it] created." BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council, 156 F.3d 756, 770 (7th Cir. 1998). The union "is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which [the union] alone is responsible for making, were otherwise." Story Parchment Co., 282 U.S. at 563, 51 S. Ct. at 250–51.

## IV. CONCLUSION

The judgment against the Southeastern Carpenters Regional Council is **AFFIRMED**.